**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **PEGGY WILSON,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:09-CV-1318-B** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **Commissioner of Social Security,** | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed November 23, 2009, and *Commissioner's Motion for Summary Judgment*, filed January 14, 2010.  Based on the filings, evidence and applicable law, Plaintiff's motion should be **GRANTED**, Defendant's motion should be **DENIED**, and the case should be remanded to the Commissioner for further proceedings..

**I.  BACKGROUND**[1]

**A.      Procedural History**

Peggy Yvonne Wilson ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits under Title II and Title XVI of the Social Security Act.  Plaintiff filed an application for disability

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

insurance benefits on February 17, 2005, and an application for supplementary security income on June 6, 2005.  (Tr. at 99, 105).  She claimed that she had been disabled since December 31, 2002, due to carpel tunnel syndrome.  (Tr. at 99-100).  Her application was denied initially and upon reconsideration. (Tr. at 40, 45).  She timely requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 50).  She personally appeared and testified at a hearing held on July 3, 2007.  (Tr. at 733-58).  On July 26, 2007, the ALJ issued his decision finding Plaintiff not disabled.  (Tr. at 393-406).  Plaintiff requested the Appeals Council to review the ALJ's decision, and on December 14, 2007, the Appeals Council vacated the ALJ's decision, and remanded the case for further administrative proceedings.  (Tr. at 411-15, ).  On July 27, 2008, she appeared and testified at a supplemental hearing before the ALJ.  (Tr. at 759-88).  On August 26, 2008, the ALJ issued his decision, finding her not disabled.  (Tr. at 15-27).  The Appeals Council denied her request for review, and the ALJ's decision became the final decision of the Commissioner.  (Tr. at 7-10).  On July 15, 2009, Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

**B.**   **Factual History**

**1.**   **Age, Education, and Work Experience**

Plaintiff was born on January 8, 1961, was 41 years old at the time of her alleged onset date, and was 47 years old at the time of the second hearing before the ALJ.  (Tr. at 103, 105, 759).  She has an eighth grade education and past relevant work experience as a waitress, cook, and warehouse worker.  (Tr. at 90, 103).

**2.**   **Medical Evidence**

On her alleged onset date, Plaintiff  injured her right hand and wrist while lifting a heavy box

of books at work.  (Tr. at 146).  An EMG/NCV was consistent with right carpal tunnel syndrome, and an MRI suggested a partial tear of the right scapholunate ligament.  *Id.*  For three months, Plaintiff was in a wrist splint and received treatment and physical therapy from Dr. Z.C. Dameron, M.D.  *Id.*  In March 2003,  Plaintiff consulted Dr. Robert D. Wilcox, M.D., who noted that Plaintiff had signs of nerve compression over the right carpal tunnel and mild pain on stress of the scapholunate ligament, but that the rest of her upper extremity was normal.  *Id.*  Dr. Wilcox recommended a cortisone injection for her carpal tunnel syndrome.  *Id.*

In April 2003, Dr. Wilcox expressed concern that Plaintiff was developing a burning pain in her right hand, wrist, and fore-arm, which was consistent with mild or beginning Reflex Sympathetic Dystrophy ("RSD").   (Tr. at 145).   The next month, Dr. Wilcox performed decompressive neuroplasty or carpal tunnel release surgery on Plaintiff's right wrist, which improved her pain for only a few months. (Tr. at 114, 137).  In October 2003, Dr. Wilcox reported Plaintiff's complaints of color changes and bouts of sweating and numbness in her right hand.  (Tr. at 141).  He noticed swelling in her right hand and noted that "she may be trying to develop" RSD. *Id.*  In December that year, Dr. Wilcox reported Plaintiff's complaints of constant pain and opined that she had recurrent carpal tunnel syndrome.  (Tr. at 137).  Dr. Wilcox gave Plaintiff a Kenalog injection and reported that she had an excellent response to it for only a week. (Tr. at 136-37).  He noted that Plaintiff had an extraordinary, unmistakable, and easily reproduced tinel's sign over the carpal tunnel radiating in her forearm and into her index and long finger.   (Tr. at 136).

On February 6, 2004, Dr. Wilcox performed another decompressive neuroplasty on Plaintiff, this time with muscle flap reconstruction.  (Tr. at 135).  About two months later, Plaintiff was still complaining of numbness, pain, burning sensation, and tingling in her right extremity.  (Tr. at 130-31).  Dr. Wilcox recommended that Plaintiff be referred to a pain management specialist to see if

RSD was setting in.  (Tr. at 130).  In June 2004, Dr. Wilcox reported that Plaintiff was seeing a pain management specialist, in physical therapy, and taking Neurontin, Celebrex, and Tylenol # 3 for her pain.  (Tr. at 129).  He reported that the she needed time to adjust to neurontin, which was making her feel a little spacy.  *Id.*  He  recommended that she continue her physical therapy, keep seeing her pain management specialist, and consider stellate ganglion blocks if RSD was determined.  *Id.*  A month later, he noted that her right hand was slightly dark and noticeably swollen.  (Tr. at 127).  He added Elavil to her medications.  *Id.*

That same month, Ralph Stein, M.D., a doctor designated by Plaintiff's worker's compensation insurer, examined her.  (Tr. at 275-76).  Plaintiff complained of "a burning sensation deep inside of her hand and wrist and up the right arm to just distal to the right elbow."  (Tr. at 275).  Dr. Stein found severe tenderness on the scar site on her right wrist and markedly less hair on her right hand and forearm compared to the left.  *Id.*  Dr. Stein advised that serious consideration be given to early development of RSD of the right arm.  *Id.*

Medical reports from July to October of 2004 reveal that Dr. Dameron consistently diagnosed Plaintiff with RSD, continued her on a medication regimen that included Neurontin, Celebrex, Tylenol, Elavil, and Nexium, and suggested a splint and heat therapy for her problems.  (Tr. at 244-66).  He noted that RSD was a real problem with no known cure and "a difficult thing on a good day."  (Tr. at 264-66).  In November 2004, Dr. Wilcox concurred in a letter to Dr. Dameron that Plaintiff had RSD, consistent with her symptoms of allodynia, dysesthesia, temperature changes, and constant burning pain.  (Tr. at 685-86).

On April 4, 2005, Dr. Thomas C. DiLiberti, M.D., P.A., examined Plaintiff at the request of the Texas Workers Compensation Commission.  (Tr. at 216).  He reported temperature differential, significant allodynia, and sweating response in Plaintiff's fingers, and significant withdrawal

reaction to any kind of light touch about the skin of her hand.  (Tr. at 217).  He noted that she exhibited "significant pain behavior" and opined that she had developed a complex regional pain syndrome as a result of either her injury, chronic nerve compression, or her surgical treatment.  *Id.* He opined that Plaintiff could not perform significant activities with the right hand, and that if her restrictions could be maintained effectively limiting her to one-armed work duties, a return to work would be possible.  (Tr. at 218).

ON June 9, 2005, Arlan Larson, M.D., conducted a consultative examination of Plaintiff. (Tr. at 147-50).  Dr. Larson noted that Plaintiff could move her right shoulder joint normally and could extend the fingers of her right hand.  (Tr. at 148).  He noted, however, that her right elbow joints were a little bit restricted, she made a slow fist, and her right hand grip and pinch were weak. *Id.*  On June 10, 2005, Joysree Subramanian, M.D., a pain management specialist, evaluated Plaintiff upon referral from Dr. Dameron.  (Tr. at 478).  Dr. Subramanian wrote to Dr. Dameron that Plaintiff had appeared drowsy and mildly distressed at the evaluation.  (Tr. at 478-79).  She reported that Plaintiff felt drowsy and spaced out from using Neurontin and Elavil, and nauseated from using Elavil, but received some relief from Tylenol # 3 and Mobic.  *Id.*  She was able to perform all maneuvers in her right forearm and wrist, but they were somewhat limited by pain.  (Tr. at 480). Dr. Subramanian assessed that Plaintiff had complex regional pain syndrome with mild carpal tunnel syndrome in the right wrist.  *Id.*  She wrote that she had given Plaintiff samples of Ultracet and Lidoderm patch, prescribed her Tramadol, continued her Neurontin and Mobic regimen, and advised her to slowly taper down her Tylenol # 3 prescription.  *Id.*  She also wrote that she had scheduled Plaintiff for a right-sided ganglion block, and would schedule her for behavioral, cognitive, and physical therapy sessions.  *Id.*

On June 10, 1005, a state agency physician opined that Plaintiff could handle, finger, and

feel with her right hand, but that her right hand and wrist had a weak grip and pinch  (Tr. at 154, 158).  On November 22, 2005, Dr. Dameron again recommended that Plaintiff wear a wrist splint, use a heating pad, and stay on her Neurontin and Tylenol # 3 regimen.  (Tr. at 471).  He noted that Plaintiff had considered the stellate blocks but only trusted Dr. Wilcox to perform the surgery.  *Id.*

On June 5, 2006, Dr. DiLiberti saw Plaintiff during an informational visit.  (Tr. at 459). Plaintiff reported that she had not had any significant active treatment in the form of physical therapy since her last visit with him in April 2005, and had not had a stellate ganglion block because she was concerned about the procedure and would only consider it if Dr. Wilcox was willing to perform it.  (Tr. at 460).  She reported that she was taking Neurontin, Mobic, and Tylenol # 3. *Id.* Dr. DiLiberti noted that Plaintiff had a positive tinel's sign on her median nerve in the right wrist, that she was tender to palpation about the distal right arm, and that there was "pain behavior with light pressure around the surgical incision just proximal to the wrist crease."  *Id.*  He noted that there were no signs of ligamentous instability, and no skin changes, hair changes, or temperature changes consistent with a complex regional pain syndrome.  *Id.*  He noticed a slightly increased sweat pattern in the right hand as compared to the left hand.  *Id.*  His impression was that Plaintiff had improved right carpal tunnel syndrome, probable active neuroma of the palmar cutaneous branch of the median nerve, and complex regional pain syndrome accompanied by its signs.  (Tr. at 460-61).  He recommended stellate ganglion blocks and surgical removal of the neuroma.  (Tr. at 461).

On August 18, 2006, Dr. Dameron noted that Plaintiff wanted him to cut her arm off.  (Tr. at 173).  He noted that Dr. Wilcox had given Plaintiff Kenalog shots with no real benefits.  *Id.*  He further noted that RSD has no known cure that is really effective.  *Id.*  On September 25, 2006, Dr. Dameron again noted that Plaintiff had been given a shot into her carpal tunnel which was effective only for two days.  (Tr. at 171).  On October 3, 2006, Dr. Wilcox noted that Plaintiff had responded

favorably to a cortisone shot directly into the neuroma, and that he would prefer to keep trying to treat her non-operatively.  (Tr. at 169).   Dr. Wilcox referred Plaintiff to a pain management specialist.  *Id.*  Over the next year, Plaintiff visited Dr. Dameron a number of times and repeatedly asked him to amputate her right arm.  (Tr. at 160-67).  Dr. Dameron recommended medication, a wrist splint, and heating pads.  *Id.*

On July 15, 2008, Dr. Dameron, in responding to a questionnaire by the ALJ, stated that Plaintiff had carpal tunnel syndrome and chronic RSD in the right upper extremity and had seen many specialists for these problems over several years.  (Tr. at 690).  He noted that he planned only "conservative care" for Plaintiff that included anti-inflammatory and mild analgesics such as Tylenol # 3.  *Id.*  He stated that Plaintiff had refused a stellate block, reasoning that the two previous surgeries had not helped.  (Tr. at 691).  He further stated that he knew of no effective treatment for RSD.  *Id.*  He opined that Plaintiff could perform light work but would need to rest her right upper extremity occasionally because of the pain.  (Tr. at 690-91).  When the ALJ asked him to opine whether Plaintiff was capable of performing sedentary work during an 8-hour work day, Dr. Dameron responded that the pain would interfere with her work.  (Tr. at 691).

### 3.   Hearing Testimony

#### a. *First Hearing*

The ALJ held a hearing on July 3, 2007 where Plaintiff, a vocational expert ("VE"), and a medical expert ("ME") testified.  (Tr. at 733-34).  Plaintiff was represented by an attorney.  *Id.*

##### i. Plaintiff's Testimony

Plaintiff testified that she was a forty-eight year old single woman with an eighth grade education living alone in an apartment.  (Tr. at 736-37).  She had previously worked as a cashier and a warehouse-worker.  (Tr. at 737-38).  Her injury occurred as a warehouse-worker, when she was

throwing a box of books on a converter belt; her wrist popped and her hand swelled.  (Tr. at 738).

She had been seeing her company doctor, Dr. Dameron, since 2002.  (Tr. at 739-40).  She had also

been seeing Dr. Wilcox, who had performed two unsuccessful surgeries on her hand.  (Tr. at 739).

The pain and swelling continued after the surgery.  *Id.*  She took medication and received therapy

for the pain, but the therapy had not helped.  (Tr. at 739, 741).   Dr. Wilcox had also given her

injections after the second surgery; the last injection she received was over a year ago.  (Tr. at 740,

743).  Earlier that year, Dr. Wilcox had also recommended Dr. John White at UT Southwestern for

a stellate ganglion block but did not schedule an appointment with him – Plaintiff's understanding

was that the doctor would schedule one for her.  (Tr. at 742, 748-49).  Plaintiff had also seen Dr.

DiLiberti for disability evaluation purposes.  (Tr. at 740).

     Plaintiff testified that the pain started in her fingers like shock-waves, turning into a feeling

of pins sticking her hand and sometimes into a burning sensation.  (Tr. at 744).  Sometimes it started

suddenly as if someone had hit a nail into her wrist, sometimes it traveled up her arm, and sometimes

it got so severe that she wanted to cut her arm off.  (Tr at. 745).  She took medications every few

hours during the day to help with her pain, had tried several different ones, and had suffered side

effects.  (Tr. at 745-46). The medications made her feel drowsy and spaced out, and she had to lay

down thirty minutes after taking them.  (Tr. at 746).  Most of her time at home was spent resting

because the medications had her "kind of out of it."  *Id.*  Sometimes, to relieve her pain, she propped

her hand on a pillow, raised it in the air for a few minutes, and wore a hand brace.  (Tr. at 745-46).

She did not have any problems with her left hand and wrist.  (Tr. at 743).  She had a couple of pain

management sessions with Dr. Seal, and had tried but decided not to pursue pain management at UT

Southwestern because the doctor there did not believe her complaints of pain.  (Tr. at 747-48).

     Concerning her daily activities, Plaintiff testified that because it was painful to raise her

hand, and because her hand would sometimes lock so that she couldn't move it, she found it difficult to wash her hair, dress, bath, cook, and button her clothes. (Tr. at 743-44). She received help from her sister, daughter, and niece, all of whom lived nearby. (744, 747). Her niece had pulled her hair back into a pony tail for her that day. (Tr. at 743-44). She could not drive and did not have a driver's license. (Tr. at 736-37).

## ii. Medical Expert's Testimony

The ME testified that Plaintiff's medically determinable impairments included carpal tunnel syndrome and RSD in her right hand, but that these impairments did not meet or equal a listing. (Tr. at 748, 750). He stated that a permanent stellate ganglion block would make her pain free. (Tr. at 751). When the ALJ asked him to identify the most restrictive RFC that Plaintiff's impairments were capable of producing, he testified that Plaintiff would have a sedentary RFC with only occasional use and non-repetitive use of her dominant right hand. (Tr. at 751).

Upon cross-examination by Plaintiff's attorney, the ME opined that Plaintiff could lift five pounds with her right hand. *Id.* The ME conceded that the pain associated with the failed carpal tunnel releases and the subsequent RSD, the loss of sleep due to the pain, the side effects of medications, and the related fatigue effect could each impact and limit a person's concentration, pace, and persistence. *Id.* He further conceded that a person with this profile would need breaks in excess of a morning break, a lunch break, and an afternoon break. (Tr. at 752). He anticipated, however, that given this profile, there would be no expected absences from an eight-hour day, five-day work week, even with the pain component and the multiple doctor visits required to treat it. *Id.*

## iii. Vocational Expert's Testimony

The VE testified that Plaintiff had worked as a cashier (light, SVP 2), fork-lift driver (medium, SVP 3), and waitress (light, SVP 3). (Tr. at 753-4). The ALJ asked the VE to assume that

- 9 -

Plaintiff was capable of lifting at the sedentary level "10 pounds occasionally, less than 10 pounds frequently with only occasional use of the right hand, [and] no repetitive use of the right hand"; had to avoid any type of forced pace or assembly line tasks; could stand or walk, for a total of six hours in an eight-hour day; and sit for a total of six hours in an eight-hour day. (Tr. at 754). The VE opined that Plaintiff with this RFC would not be able to perform her past work. *Id.* The VE testified that a hypothetical individual, with the same RFC, age, education and experience as Plaintiff, would be able to perform the jobs of a surveillance monitor (sedentary, SVP 2, with 706 regional and 7,060 national positions), film touch-up inspector (sedentary, SVP 2, with 996 regional and 9,960 national positions), and a button inspector (sedentary, SVP 2, with 3,344 regional and 33,440 national positions). (Tr. at 754-55). The VE testified that the hypothetical individual could perform all these jobs even if she had could only use her right arm as a guide. (Tr. at 755). The VE precluded all competitive employment if the impairments required taking two days off per month, or if concentration, pace, and persistence were impacted on more than an occasional basis. *Id.*

### b. Second Hearing

On June 27, 2008, Plaintiff and a VE testified at a supplemental hearing. (Tr. at 760).

#### i. Plaintiff's Testimony

Plaintiff testified that since the date of the last hearing, her pain had gotten worse, she was seeing Dr. Dameron once a month, and he still had her on pain medication. (Tr. at 761, 767). He had not done any nerve blocks or pain blocks or a stellate ganglion block to her right arm because the insurance company would not pay for them. (Tr. at 761-62, 767). She stated that she had not sought free medical treatment at the Texas Department of Assistive and Rehabilitative Services because she did not know about the program. (Tr. at 762). She testified that she could not sleep because of the pain and could sleep for only one hour at night despite taking Ambien, a sleep aid.

(Tr. at 763-64).  Her right hand still hurt from her fingers to her wrist, and sometimes it froze.  (Tr. at 764).  She could put food in the microwave but could not cook because she dropped things.  *Id.*  Plaintiff testified that Dr. Wilcox did not think that a stellate ganglion block was necessary, and that she herself thought that a third surgery would not help with her pain.  (Tr. at 764-65).  She also testified that Dr. Wilcox was giving her pain shots that made her arm numb and pain-free only for a couple of days.  (Tr. at 765).

Plaintiff testified that she was mostly at home lying down or "trying to do a little bit of stuff." (Tr. at 769).  She estimated that from eight o'clock in the morning to five o'clock in the afternoon, she spent about five hours lying down.  (Tr. at 771).  She had tried unsuccessfully to get a job at some churches but they would not hire her after inquiring about her hand.  (Tr. at 769).  She testified that she could button her shirt sometimes but it took her longer to do it. (Tr. at 769-70).  She sometimes tried to use her right hand to write.  *Id.*  Plaintiff stated that the medication she took made her dizzy and forgetful.  (Tr. at 770).  Because she could not sleep, her fatigue problem was still unresolved.  (Tr. at 770-71).  Her daughter helped her clean the house, and sometimes helped her comb her hair and take a bath.  (Tr. at 771).  She could only read and write some, and her daughter and sister had helped her complete the social security forms.  (Tr. at 772, 785-86).

## ii. Vocational Expert's Testimony

The VE testified that Plaintiff had worked as a waitress (light, SVP 3), fast-food cook (medium, SVP 5), fork-lift operator (medium, SVP 3), shipping and receiving clerk (medium, SVP 5), and warehouse worker (medium, SVP 2).  (Tr. at 774).  The ALJ asked the VE to assume that Plaintiff was "at the sedentary capacity, which is lifting 10 pounds occasionally and less than 10 pounds frequently"; was able to stand and walk for two hours in an eight-hour day, and sit for six

hours in an eight hour day; could not lift anything with her right arm; and could not use her right

upper extremity. *Id.* The VE opined that Plaintiff could not perform her past work but could

perform other jobs existing in significant numbers in the economy, such as the jobs of a pneumatic

tube operator (sedentary, SVP 2, with 1,423 regional and 14,230 national positions), systems

surveillance monitor (sedentary, SVP 2, with 2,091 regional and 25,119 national positions), and call-

out operator (sedentary, SVP 2, with 1,398 regional and 18,771 national positions). (Tr. at 774-75).

If Plaintiff did not have the capacity to complete a normal eight-hour work day or 40-hour work

week, she would not be competitive to perform these jobs and would not be competitive at all in the

national economy. (Tr. at 775-76). Upon cross-examination by the attorney, the VE testified that

if a person needed a break in excess of a morning break, lunch break and afternoon break, due to

pain or side effects of medication, the jobs would be impacted depending on the frequency and

length of the breaks. (Tr. at 783-84). If concentration, pace, and persistence were limited to the

extent that they impacted the workday on an occasional basis, the person's ability to work and

complete a full eight-hour workday would be impacted. (Tr. at 784).

## C.   ALJ's Findings

The ALJ denied Plaintiff's application for benefits by written opinion issued on August 26,

2008. (Tr. at 15-27). The ALJ analyzed Plaintiff's claim pursuant to the five-step sequential

evaluation process. (Tr. at 19-20). At step one, the ALJ found that Plaintiff had not engaged in

substantial gainful activity since her alleged onset date. (Tr. at 20, ¶2). At step two, the ALJ

determined that Plaintiff's carpel tunnel syndrome and RSD were severe impairments. (Tr. at 20,

¶3). At step three, the ALJ found that Plaintiff's impairments did not meet or equal one of the listed

impairments. (Tr. at 23, ¶4). The ALJ found that Plaintiff had the residual functional capacity to

lift up to 10 pounds occasionally, lift and carry up to10 pounds frequently, stand or walk for 2 hours in an 8-hour work day, and sit for 6 hours in an 8-hour workday.  (Tr. at 23, ¶5).  The ALJ found, however, that Plaintiff could not effectively use her right upper extremity to lift, carry, push, or pull and that the use of her right upper extremity would be as a guide only.  *Id.*  The ALJ further found that claimant had a limited education.  (Tr. at 26, ¶8).  At step four, the ALJ found that Plaintiff was unable to perform any past relevant work.  (Tr. at 25, ¶ 6).  At step five, the ALJ found that based on her age, education, work experience, and residual functional capacity, Plaintiff could perform jobs that existed in significant numbers in the national economy.  (Tr. at 26, ¶10).  Based on these findings, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from the date of her application through the date of his decision.  (Tr. at 27, ¶11).

## II.  ANALYSIS

### A.  Legal Standards

#### 1.  Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding

of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.*

### 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). The Commissioner utilizes a sequential five-step inquiry to determine whether an adult is disabled and entitled to benefits under the Social Security Act:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

- 14 -

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.     Issue for Review**

Plaintiff presents one issue for review: whether the ALJ failed to articulate a basis for rejecting the credibility of Plaintiff's description of the pain and limitations caused by her reflex sympathetic dystrophy.  (P. Br. at 1).

- 15 -

C.    **Credibility**

Plaintiff contends that the ALJ failed to articulate the requisite credibility findings concerning her subjective complaints of pain and its limitations in accordance with Social Security Rulings ("SSRs") 96-7p and 03-2p.  (P. Br. at 11-14).  She claims that the ALJ was inconsistent when he acknowledged that her statements regarding her pain and its limitations appeared sincere and genuine and would prevent her from performing even sedentary work if accepted but later ignored these statements in determining her RFC. (Tr. at 10-11).  She further contends that she was prejudiced by the ALJ's failure to apply proper legal standards because the ALJ himself acknowledged that she would be found disabled if her statements were accepted.  (Tr. at 14-15).

Credibility determinations by an ALJ are entitled to deference.  *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991).  The ALJ is in the best position to assess a claimant's credibility since the ALJ "enjoys the benefit of perceiving first-hand the claimant at the hearing."  *Falco v. Shalala*, 27 F.3d 164 n.18 (5th Cir. 1994). SSR 96-7p requires the ALJ to follow a two-step process for evaluating a claimant's  subjective complaints.  SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).  First, the ALJ must consider whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  *See id.*  Once such an impairment is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities.  *Id.*  If the claimant's statements concerning the intensity, persistence, or limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding regarding the claimant's statements.  *Id.*; *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985)).

The ALJ's credibility determination must be based on a consideration of the entire record, including medical signs and laboratory findings; and statements by the claimant, and his treating or examining sources, concerning the alleged symptoms and their effect.  SSR 96-7p, 1996 WL 374186, at *2.  The ALJ must also consider a non-exclusive list of seven relevant factors in assessing the credibility of a claimant's statements: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms."  *Id.* at *3.

Even though the Fifth Circuit does not require an ALJ to "follow formalistic rules" in assessing a claimant's subjective complaints, "the ALJ must articulate reasons for rejecting" any such complaints.  *Falco*, 27 F.3d at 163-64.  In other words, the ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Id.*

Here, the ALJ's written decision stated that he had considered Plaintiff's symptoms in accordance with SSR 96-7p and 20 C.F.R. 404.1529.  (Tr. at 23).  In particular, it stated:

> The claimant appears to be sincere and genuine regarding the pain and limitations she states she experienced with her medical impairments.  If accepted as she describes, she would be prevented from completely performing even sedentary functions.  Notwithstanding, the claimant cannot be found disabled no matter how

> genuine the complaints may appear to be, if the disability must be the product of an
> identified medically determinable impairment "reasonably capable of producing" the
> symptoms, a requirement imposed by the Social Security Act. See SSR 96-7p, *Hollis
> v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988); *Cook v. Massanari*, 2001 U.S. Dist.
> Lexis 9195 (N.D. Ill). The claimant's lay intuition as to the cause of the symptoms,
> however real the symptoms, is not controlling. *Frank v. Barnhart*, 326 F.3d 618, 622
> (5th Cir. 2003).

*Id.* These statements appear to be a credibility finding about Plaintiff's subjective complaints of pain. However, the weight accorded Plaintiff's complaints, or whether the ALJ found those complaints credible, is unclear. Even if the written decision can be construed to include an implicit finding that Plaintiff's complaints were not credible, the ALJ does not articulate his reasons for that finding.

Additionally, he does not address the factors listed in SSR 96-7p and 20 C.F.R 404.1529 for evaluating the intensity, persistence, and limiting effects of Plaintiff's pain, despite ample evidence in the record regarding those factors.[2] He does not appear to consider the location, duration, frequency, and intensity of Plaintiff's pain; any precipitating and aggravating factors; and the measures used to relieve pain. SSR 96-7p , 1996 WL 374186, at *3. More importantly, the ALJ does not address the type, dosage, effectiveness, and side effects of Plaintiff's medication, despite a considerable amount of evidence in the record regarding that factor. *Id.*; (Tr. at 129, 244-66, 459, 471, 478-79, 690, 745-46, 751, 770, 783-84). He only makes a statement that Dr. Dameron planned conservative care for Plaintiff, including anti-inflammatory and over-the-counter analgesics like Tylenol.[3] (Tr. at 24).

---

[2] The ALJ failed to evaluate the factors despite the Appeals Council's directive that he specifically address these factors. (Tr. at 411-18).

[3] Dr. Dameron stated that he planned to treat Plaintiff with Tylenol # 3, not over the counter Tylenol. Tylenol # 3 is a prescription drug that contains codeine. *See* Drugs@FDA, U.S. Food and Drug Administration, http://www.accessdata.fda.gov/Scripts/cder/DrugsatFDA/ (last visited Mar. 15, 2010).

Where, as here, RSD is established as a medically determinable impairment, "the effects of chronic pain and the use of pain medications must be carefully considered" in evaluating its duration and severity, and in evaluating the claimant's RFC. SSR 03-2p, 2003 WL 22399117, at *5(S.S.A. Oct. 20, 2003). This is because chronic pain and many of the medications prescribed to treat it may affect an individual's ability to maintain attention and concentration, adversely affect his or her cognition, mood and behavior, reduce motor reaction times, interfere with his ability to sustain work activity over time, and preclude sustained work activity altogether. *Id.*

By not addressing the seven relevant factors, the ALJ violated SSRs 96-7p and 03-2p. A violation of a ruling may "constitute error warranting reversal and remand when an aggrieved claimant shows prejudice resulting from the violation." *Pearson v. Barnhart*, 2005 WL 1397049, at *4 (E.D. Tex. May 23,2005) (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000). A claimant establishes prejudice by showing that adherence to the ruling might have led to a different decision. *Newton*, 209 F.3d at 458 (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir.1995)).

Here, if the ALJ had conducted a credibility analysis and considered the relevant factors in compliance with the rulings, he might have reached a different conclusion regarding Plaintiff's disability claim, especially since he himself stated that Plaintiff appeared sincere and genuine in her complaints, and that if her complaints were true, she would be precluded from performing even sedentary functions. (Tr. at 23). Plaintiff has shown that the ALJ's improper credibility analysis resulted in prejudice, and thus remand is required. *See Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir.1981).

Defendant argues that there is no prejudice because the ALJ's RFC finding stated that Plaintiff had no effective use of her right extremity and would be used as a guide only. (D. Br. at

8).  Even though the ALJ includes this limitation in his RFC, he did not find that Plaintiff's concentration, pace, and persistence would be affected.  Had he found Plaintiff's complaints of pain credible and carefully considered the side effects of her medications, he might have credited the ME's testimony that they each could impact Plaintiff's concentration, pace, and persistence, and the VE's testimony that if they were impacted on more than an occasional basis, all employment would be precluded.  (Tr. 751, 755).  There is prejudice from the ALJ's improper credibility analysis.

Defendant also contends that Plaintiff's failure to follow her physician's recommendation and get a stellate ganglion block precludes a disability finding.  (D. Br. at 10).  Failure to follow a recommended course of treatment without good reason precludes a disability finding.  20 C.F.R § 404.1530; *Johnson v. Sullivan*, 894 F.2d 683, 685 n. 4 (5th Cir. 1990).  "If, however, the claimant cannot afford the prescribed treatment and can find no way to obtain it, the condition that is disabling in fact continues to be disabling in law." *Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th Cir. 1986). Plaintiff claims that her insurance refuses to pay for the treatment, and it is unclear whether she qualifies for government assistance.  (*See* Tr. at 761-62, 767).  The Court cannot determine that her disability was precluded for failure to get the recommended surgery.  *See Wingo v. Bowen*, 852 F.2d 827, 831 (5th Cir. 1988).

## III.   RECOMMENDATION

The decision of the Commissioner should be **REVERSED** and the case **REMANDED** for further proceedings consistent with this opinion.

**SO RECOMMENDED, on this 19th day of March, 2010.**

**IRMA CARRILLO RAMIREZ**
**UNITED STATES MAGISTRATE JUDGE**

## INSTRUCTIONS FOR SERVICE AND
## <u>NOTICE OF RIGHT TO APPEAL/OBJECT</u>

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE